Eric H. Gibbs (SBN 178658)
Michael Schrag (SBN 185832)
Caroline Corbitt (SBN 305492)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:  (510) 350-9700
Facsimile:  (510) 350-9701
ehg@classlawgroup.com
mls@classlawgroup.com
ccc@classlawgroup.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID CARNEY, | Case No. 5:17-cv-00743 |
| Plaintiff, on behalf of himself and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| QUALCOMM INCORPORATED, | |
| Defendant. | |

CLASS ACTION COMPLAINT

Plaintiff David Carney ("Plaintiff"), on behalf of himself and all others similarly situated, for his Complaint against Defendant Qualcomm Incorporated ("Qualcomm"), states and alleges as follows:

## INTRODUCTION

1.     Consumers are commonly aware that when they purchase a cellular device such as an iPhone, they will be "locked in" to operating the device on a particular network carrier such as Verizon. Less commonly known is that one of the underpinnings of this restriction is a chip within the cellular device known as a "modem chipset."

2.     A modem chipset is a semiconductor unit that allows a cellular device to communicate with a cellular network and other devices. Chipsets are configured to run on a particular network's wireless telecommunications standard, such as the common standard of "4G LTE." Chipsets may also allow cellular devices to access legacy wireless networks standards such as "2G CDMA" and "3G UMTS." Networks use and support legacy network standards for voice calls as well as data transmission in areas with older infrastructure.

3.     The LTE standard is used for most current fourth-generation cellular networks. The specifics of legacy second- and third-generation standards vary greatly by network carrier, however. For example, AT&T and T-Mobile operate legacy 2G GSM networks, while Verizon and Sprint operate legacy 2G CDMA networks. Chipsets commonly allow a device access to 4G and a particular standard of legacy technology such as CDMA, but do not allow devices to access alternative standards of legacy technology such as GSM. Device manufacturers therefore utilize different chipsets for products manufactured for each different cellular network, and license the use of different patented technologies related to these networks.

4.     Qualcomm is a dominant supplier of modem chipsets and holds a monopolistic share of two types of chipsets: CDMA and premium LTE. Qualcomm's product market share of CDMA and LTE chipsets has consistently been over 80 percent for these two chipsets since the inception of these standards.

5.     Qualcomm also holds the intellectual property rights to a large number of patents which are essential to CDMA and LTE cellular standards. The use of these patents, known as

1

standard essential patents ("SEPs"), is mandated by cellular standard setting organizations. Manufacturers of cellular device components and devices must license technologies that they do not have preexisting rights to in order to compete in the market for cellular devices. Just as consumers are locked in to their network carrier, manufacturers are locked in to licensing SEPs from patent holders such as Qualcomm.

6.    In order to alleviate the competitive concerns posed by the SEP structure, patent holders agree to license SEPs on "fair, reasonable, and non-discriminatory terms." Yet rather than operate in a fair, reasonable, and non-discriminatory way, Qualcomm has leveraged its monopolistic market position into charging other manufacturers and competitors supracompetitive prices for both its chipsets and access to its SEPs. Through anticompetitive practices, Qualcomm has also driven competitors out of the marketplace and limited the ability of new competitors to enter. Qualcomm's practices have been condemned by antitrust regulators across the world, including agencies in Europe, Asia, and the United States.

7.    Qualcomm's conduct increases the cost structure of the cellular market—and these costs are passed on to the consumer in the form of higher prices. As a result of Qualcomm's conduct, Plaintiff and other consumers have been harmed by overpaying for cellular devices. Plaintiff brings this action on behalf of himself and others similarly situated to recover for injuries resulting from Qualcomm's violations of the Sherman Act and state antitrust and consumer protection laws. Plaintiff and Class members seek monetary damages, injunctive relief, and any other available remedies to which they are entitled for Qualcomm's unlawful conduct.

## PARTIES

8.    Plaintiff David Carney is a resident of Oakland, California. Carney purchased an Apple iPhone 6 for personal use and not for resale.

9.    Defendant Qualcomm Incorporated is a Delaware corporation with its principal place of business in San Diego, California. It has two main segments that are wholly owned subsidiaries: Qualcomm CDMA Technologies ("QCT"), which manufactures and sells cellular phone components, and Qualcomm Technology Licensing ("QTL"), which licenses the rights to Qualcomm's patent portfolios.

CLASS ACTION COMPLAINT

10.     Qualcomm has extensive office facilities in this District, including in Santa Clara, San Francisco, and Alameda counties.

## JURISDICTION AND VENUE

11.     This action arises under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 16, for Defendant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section Three of the Clayton Act, 15 U.S.C. § 3. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 22 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and Qualcomm does business and operates facilities in this District. Qualcomm is engaged in interstate commerce, and the activities that form the basis of this Complaint substantially impact interstate commerce.

## INTRADISTRICT ASSIGNMENT

13.     Assignment is proper to the San Jose division of this District under Local Rule 3-2(c)-(e), as a substantial part of the events that give rise to Plaintiff's claims occurred in Santa Clara County. Third parties that have information relevant to this action, including cellular device manufacturers and Qualcomm competitors, also have offices in Santa Clara County.

## SUBSTANTIVE ALLEGATIONS

### Qualcomm

14.     Qualcomm is a semiconductor and telecommunications company. Qualcomm reported over $23.5 billion in revenues in its fiscal year ending in September 2016, and reported first quarter 2017 revenues of $6.0 billion.

15.     Qualcomm's principal businesses are the development, design, and marketing of semiconductor devices used in cellular phones and other mobile consumer products such as computer tablets, as well as the licensing of technology related to these devices. Qualcomm manufactures and sells semiconductor devices commonly referred to as "modem chipsets" or "baseband processors" to allow a cellular device to communicate with cellular networks through its

3

QCT unit. Qualcomm also licenses rights to its telecommunications technology through its QTL unit.

16.    QCT generates the majority of Qualcomm's revenue, but QLT generates the majority of Qualcomm's profits. In 2016, QCT generated $15.4 billion in revenues compared with the $7.7 billion generated by QTL. However, QTL generated $6.5 billion in earnings before taxes—85% of QTL revenues—while QCT generated only $1.8 billion on the same metric.

<u>Cellular Chipsets and Standards</u>

17.    Modem chipsets allow cellular phones and other mobile wireless devices such as tablets to communicate with an operator's cellular network. They are key electronic components that allow cellular deceives to receive and transmit calls and data to and from a wireless network by performing functions such as signal generation, frequency shifting, modulation, and encoding.

18.    These communication functions are made possible by the implementation of uniform cellular communication protocols, or "standards." There have been four generations of cellular communications standards since the introduction of commercial cellular phones in the 1980s:

    a.    First generation ("1G") standards, which support analog transmission of voice calls.

    b.    Second generation ("2G") standards, which support digital transmission of voice calls. Leading 2G standards families are the Global System for Mobile communications ("GSM") and second-generation Code Division Multiple Access ("2G CDMA"). In the United States, AT&T and T-Mobile operate legacy GSM networks, while Verizon and Sprint operate legacy 2G CDMA networks.

    c.    Third generation ("3G") standards, which support higher data transmission speeds. The leading 3G standards families are the Universal Mobile Telecommunications System ("UMTS") and third-generation CDMA ("3G CDMA"). UMTS allowed GSM-network operators to transition economically to a 3G standard. 3G-CDMA did the same for 2G-CDMA-network operators such as Verizon and Sprint.

d.    Fourth generation ("4G") standards, which support substantially higher transmission speeds than 3G. Most major network operators utilize the Long-Term Evolution ("LTE") 4G standard.

19.    Multi-mode chipsets allow a cellular device to communicate with a cellular network that employs multiple standards. In practice, virtually all chipsets within cellular devices are multi-mode. While most major cellular networks currently operate on a 4G LTE standard, they must support older, legacy 2G and 3G standards. These legacy standards are still largely used for voice calls as well as for data transmission in network areas with older infrastructure.

20.    Cellular devices in the United States are configured for one particular carrier such as Sprint or Verizon, and can only be used on the network and standards for which they are configured. Most multi-mode chipsets within cellular phones support only certain legacy 2G or 3G standards—meaning that devices which are designed to be operated on some legacy standards cannot be used on other legacy standards. For example, a multi-mode chipset may support Verizon's 2G and 3G CDMA standards, but not a competitor's 2G GSM and 3G UMTS standards. Consumers are therefore tied to the use of a particular carrier for a given cellular device.

Standard Setting Organizations

21.    In order to allow calls and data to be transmitted between different cellular devices across different networks, cellular network providers such as Verizon, chipset manufacturers such as Qualcomm, and cellular device manufacturers such as Apple have established standard setting organizations ("SSOs"). Major SSOs include the European Telecommunications Standard Institute ("ETSI"), Alliance for Telecommunications Industry Solutions ("ATIS"), and the Telecommunications Industry Association ("TIA"). The TIA is the primary SSO for the telecommunications industry in the United States.

22.    SSOs adopt cellular communications standards, including CDMA and LTE standards, to ensure interoperability of cellular devices and networks. In doing so, they specify which technologies can be used to comply with these standards. When these technologies are patented, they are referred to as standard essential patents ("SEPs"). A holder of an SEP brings the patent to the attention of SSOs through declaring that it is essential to an adopted cellular standard.

5

In prescribing standards, SSOs effectively mandate the use of the patented technologies in the manufacturing and operating of cellular phones, because they are often the only compliant viable technologies.

23.     The fact that manufacturers of cellular devices must license SEPs in order to comply with applicable SSO-established standards creates a "lock in effect": companies must use and continue to use the SEPs prescribed by applicable standards in order to sell products and services that are compliant with SSOs and competitive in the market. Competitors therefore are locked into established technologies and have little incentive to develop better or cheaper technologies to compete with established SEPs.

24.     SEP holders have a monopoly over a given cellular technology because they lack any viable competition. This monopoly presents antitrust concerns. Potentially, SEP holders could demand supracompetitive royalty payments for the licensing of their SEPs by harnessing their monopolistic market power. Such a phenomenon is referred to as "patent hold-up," because companies must either license a patent and accept the licensor's terms or face litigation for using technology without a license. Moreover, complying with SSO-prescribed standards by licensing multiple SEPs creates a risk of "royalty stacking," where royalty payments stack on top of each other. The inflated prices demanded by an SEP holder may then be passed through to the consumer.

25.     To reduce the likelihood of these anticompetitive behaviors, SSOs require that holders of SEPs agree to license their technology to all manufacturers and carriers, including competitors, on fair, reasonable, and nondiscriminatory terms, known as "FRAND" obligations. This ensures that manufacturers of component parts cannot gain a monopoly through refusing to grant SEP licenses to competitors. If a patent holder will not promise to grant licenses on FRAND terms, the SSO will not include the technology in the proposed standard.

26.     FRAND compliance is critical for the telecommunication industry's adherence to antitrust laws and regulations.  By making a FRAND commitment, a patent holder accepts the benefits of the incorporation of its patented technologies into a standard, but agrees in exchange not to exercise any market power resulting from its patent's incorporation into that standard. A FRAND licensing rate should be equivalent to the competitive royalty rate that would be negotiated between

6

a patent holder and licensee without the additional market power granted by the SEP monopoly. SEPs that are less essential to a standard therefore command a lower price.

Qualcomm's Monopoly Over Chipset Patents

27.    Qualcomm has long been the leading supplier of modem chipsets worldwide. Qualcomm has been particularly dominant in the supply of two types of chipsets: chipsets that comply with CDMA standards and chipsets that comply with advanced LTE standards. LTE functionality has become increasingly critical as "smartphones" become increasingly popular in the marketplace. Component and device manufacturers seeking to produce and sell smartphones such as the iPhone or Samsung Galaxy need a supply of premium LTE-compatible chipsets.

28.    Qualcomm pioneered CDMA technology and has a monopoly on the 2G and 3G CDMA chipset markets: since 2001, it has had a product market share of 80 to 90% of the CDMA market.

29.    Due to its role in pioneering CDMA and CDMA market dominance, Qualcomm also holds many SOPs related to CDMA products. This means that manufacturers of CDMA-based cellular devices must obtain licenses to SOPs from Qualcomm. Licensees pay a one-time fee for SOP access and then royalties based on the final product, such as a smartphone, sold by the licensee. Nearly all wireless companies have licensed Qualcomm's patents.

30.    As a result of its CDMA dominance, Qualcomm has reaped more than $50 billion in licensing revenues since 2000, and charges a royalty on nearly every smartphone made.

31.    Qualcomm also holds a massive and valuable patent portfolio that applies to 4G LTE technologies. Over 90 companies (including LG, Nokia, and Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in LTE-standard products.

32.    While LTE does not implement CDMA-based technologies, Qualcomm has leveraged its monopoly power over CDMA technology to gain a greater share of the premium LTE-chipset market. Many of the 4G-based cellular devices must be backward-compatible with CDMA-based technologies that are still in use today. Qualcomm is the exclusive supplier of multimode CDMA-LTE chipsets that are backward compatible with CDMA and which are necessary to operate cellular devices on the Verizon and Sprint networks.

CLASS ACTION COMPLAINT

33.    The following chart, prepared by the Korean Fair Trade Commission, demonstrates how Qualcomm has used control over CDMA-based technologies to acquire more power and control over the chipset market as a whole.



34.    The Korean Fair Trade Commission estimated that Qualcomm had the following market shares in each of the main chipset markets:

**<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)>**

|      | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE  | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA| 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

* Source: Strategy Analytics

35.    In sum, Qualcomm holds a dominant position in the CDMA chipset market, on which devices sold by Verizon and Sprint continue to depend.  It also holds a dominant position over the premium LTE-chipset supply used by all major network carriers in high-end smartphones.

36.    Qualcomm has leveraged its monopoly power over the supply of chipsets to force device manufacturers into anticompetitive licensing agreements, contrary to its FRAND obligations.  Because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, device manufacturers have to accept unreasonable license terms as dictated by Qualcomm.  As one commentator has noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled

8

leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[1]

37.     Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to modem chipsets. Thousands of Qualcomm patents are essential to CDMA, UMTS, and LTE standards.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS, and LTE technologies because original equipment manufacturers ("OEMs") cannot produce 3G and 4G devices without risking litigation with Qualcomm. Consequently, OEMs are forced to license Qualcomm's SEP portfolio.

38.     Qualcomm has structured its business to maintain that licensing power. In 2007, Qualcomm stated that any manufacturers using CDMA and UMTS technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[2]

39.     Qualcomm also leverages its large number of SEPs to require OEMs and others to license its entire patent portfolio. This patent portfolio includes non-SEPs—patents that are either not essential to a given cellular standard or replaceable by other technologies. In doing so, Qualcomm both forces OEMs to license unessential technologies and sidesteps its obligation to license SEPs on a FRAND basis. There is no requirement that non-SEPs be licensed on FRAND terms.  Therefore, by grouping both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  This allows Qualcomm to charge excessive and unfairly high royalties to licensees.

40.     High barriers to entry protect Qualcomm's monopolies in both the CDMA and LTE markets. These barriers include the required investment of hundreds of millions of dollars in research and development, SEP licensing requirements, and the scale necessary to achieve economies that make products competitive, and Qualcomm's own exclusionary conduct.

---

[1] Richard A. Taddonio, Long – Qualcomm (NASDAQ: QCOM) - $68.42, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited February 13, 2017).

[2] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

9

41.     In sum, Qualcomm maintains a monopoly in the CDMA and premium LTE chipset markets through anticompetitive practices that have driven competitors out of the market and prevented new entrants. These anticompetitive practices are further detailed below.

<u>Qualcomm's FRAND Violations and Anticompetitive Behaviors</u>

42.     Qualcomm has maintained its monopoly over CDMA and premium LTE chipsets by refusing to offer its associated SEPs on FRAND terms to competing manufacturers.

43.     From 1999 to 2007, Qualcomm only offered its SEPs to other chipset manufacturers on non-FRAND terms. Since 2008, Qualcomm has simply refused to offer any licenses to potential competitor manufacturers despite requests from Intel and Samsung for FRAND licenses.

44.     Qualcomm's conduct has violated FRAND principles and has constituted deceit and fraud on the SSOs. It has also injured Plaintiff and other consumers who have paid unreasonably high prices for cellular devices as a result of Qualcomm's royalty demands.

45.     During the development of the 3G UMTS standard, Qualcomm made written representations to SSOs that it would offer all of its SEPs on FRAND terms. However, Qualcomm has in fact refused to offer its SEPs on FRAND terms to other 3G chipset manufacturers.

46.     3G UMTS was first developed in 1999. Qualcomm waited until 2001 to disclose its SEPs that would be essential to the new standard to ensure that UMTS could not be developed in a way that would minimize the use of Qualcomm's intellectual property. And when competitor Broadcom introduced a UMTS chipset in 2006, Qualcomm asserted that Broadcom did not have a license to Qualcomm's SEPs related to the UMTS standard.

47.     Qualcomm sought to prevent Broadcom and other UMTS chipset manufacturers from effectively competing in the chipset manufacturing market. Qualcomm insisted on non-FRAND terms to Broadcom and other UMTS chipset manufacturers. Qualcomm demanded that OEMs who wanted to license SEPs reveal confidential information about Qualcomm's competitors such as Broadcom—and penalized OEMs who licensed Qualcomm's SEPs but did not use Qualcomm chipsets. Qualcomm forced OEMs who used non-Qualcomm UMTS chipsets to enter into licensing agreements that ensured that OEMs paid double royalties at both the component and cellular device level. By contrast, Qualcomm incentivized OEMs to use Qualcomm chipsets by

10

1  allowing device manufacturers to deduct the cost of a Qualcomm-manufactured UMTS chipset

2  from the device unit price.

3      48.    Qualcomm also has exploited its CDMA and premium LTE chipset monopoly to

4  artificially constrain chipset supply since 2001. Qualcomm threatened OEMs with a potential

5  disruption in the supply of CDMA chipsets and a loss of various Qualcomm services unless

6  customers also purchased Qualcomm's UMTS chipsets. Qualcomm also has refused to enter into

7  industry standard agreements that guarantee OEMs with a certain amount of chipsets. These actions

8  have granted Qualcomm artificial leverage over OEMs in negotiations.

9      49.    Qualcomm retaliates against competitors that challenge its antitrust practices by

10  filing intellectual property infringement lawsuits. In 2003, Qualcomm sued Texas Instruments for

11  violating a non-disclosure provision before ultimately dropping the lawsuit because it would

12  otherwise have had to disclose the terms of other licensing terms in an open court proceeding. In

13  2005, Qualcomm filed patent infringement actions against Broadcom and Nokia within days of

14  those competitors filing antitrust actions against Qualcomm. On November 11, 2005, Qualcomm's

15  general counsel Lou Lupin stated "We have followed up on Nokia and Broadcom only because we

16  have other disagreements with the companies." He added that "We do not have any plans, nor does

17  it seem likely, that we will lodge any similar complaints against other manufacturers."

18      50.    At the time of its clash with Broadcom, Qualcomm still acknowledged that its

19  FRAND commitments required it to license its SEPs to competitors (even though its license terms

20  did not comply with FRAND). In 2005, Qualcomm stated to the European Commission that it

21  "never refused to license our essential patent to any company to supply chips, devices, infrastructure

22  or test equipment."

23      51.    Beginning around 2007, Qualcomm began to entirely reject attempts by other OEMs

24  to license Qualcomm's SEPs. Qualcomm now routinely refuses to license SEPs to its competitors

25  to drive them out of the market for CDMA and premium LTE chipsets. Chipset manufacturers

26  including Samsung, Intel, and Via have requested SEP licenses from Qualcomm but have been

27  refused.

28

CLASS ACTION COMPLAINT

52.     Qualcomm has also strongly resisted attempts to split QCT, its chipset manufacturing division, and QTL, its patent licensing arm, into separate companies. In 2015, an activist hedge fund sought to divide Qualcomm, arguing that the company was not being properly valued because the stock market was not sufficiently valuing QCT. But Qualcomm's corporate leadership recognized that the ability to leverage SEP licensing into increased chipset sales were responsible for the unique "synergies" of Qualcomm.[3] Qualcomm President Derek Aberle warned proponents of a separation "You have to step back and say why is that and would a separation actually solve whatever the underlying issues are that are creating the current valuation. . . . You have to be careful that it's not too simplistic an analysis."[4]

53.     Qualcomm publicly rejected the proposed separation in December 2015. CEO Steve Mollenkopf stated that "the strategic benefits and synergies of our model are not replicable through alternative structures."

54.     Qualcomm's practices allow it to charge inflated prices for its CDMA and premium LTE chipsets, which are passed onto consumers in the form of overcharges.

<u>Qualcomm's Exclusive Dealing Arrangements with Apple</u>

55.     Qualcomm has maintained its monopolistic control of the CDMA and LTE chipset markets by forming exclusive dealing agreements with Apple to prevent competitors from entering the market.

56.     Apple, as a manufacturer of iPhones and iPads, is one of the largest purchasers of chipsets in the world. Unlike other OEMs, however, Apple does not directly license chipsets. Instead, Apple employs contract manufacturers that license Qualcomm SEPs. The contract manufacturers pass on the costs of the Qualcomm royalties they pay to Apple.

---

[3] Why Qualcomm Has Ruled Against the Spin-Off of Its Chip Business in the Offing?, Forbes (July 2, 2015), http://www.forbes.com/sites/greatspeculations/2015/07/02/why-qualcomm-has-ruled-against-the-spin-off-of-its-chip-business-in-the-offing/#52945abf1727 (last visited Feb. 13, 2017).

[4] Qualcomm President Says Splitting Company May Not Create Value, Reuters (Sept. 3, 2015), http://www.reuters.com/article/us-qualcomm-president-idUSKCN0R32HL20150903 (last visited Feb. 13, 2017).

CLASS ACTION COMPLAINT

57.    Apple has repeatedly negotiated with Qualcomm in attempts to reduce the excessive royalties that Qualcomm has demanded for the supply of its CDMA and premium LTE chipsets and the licensing of its SEPs.

58.    In 2007, Qualcomm agreed to give Apple a rebate of all royalties that Qualcomm received from Apple's contract manufacturers over a specified per-unit cap. In return, Apple agreed not to incorporate the proposed 4G WiMax cellular standard that was advocated by Intel and opposed by Qualcomm. This action helped ensure the adoption of the 4G LTE standard that contained a higher percentage of Qualcomm SEPs.

59.    In 2011, Qualcomm and Apple entered into a new agreement: Qualcomm agreed to make billions of dollars in rebate payments to Apple from 2011 to 2016 if Apple agreed to exclusively utilize Qualcomm chipsets in all new iPhone and iPad models. (Apple would forfeit both past and future incentive payments if it launched a new device with a non-Qualcomm chipset.) In 2013, Qualcomm and Apple modified this agreement to extend its exclusivity provisions until 2016.

60.    Qualcomm also demanded that Apple agree to neither initiate nor induce others to initiate litigation that Qualcomm had failed to offer licenses on FRAND terms.

61.    Even with rebates, Apple still paid Qualcomm a higher amount in royalties than it collectively paid to other SEP holders who together owned a far higher percentage of patents for the 4G standard. Qualcomm also used its market power as leverage to require Apple to accept numerous unreasonable contract terms: Qualcomm refused to guarantee Apple a supply of chipsets, arbitrarily limited its liability for failure to supply, and forced Apple to license its own patents to Qualcomm or other Qualcomm licensees.

62.    Qualcomm's ability to demand inflated royalty rates from one of the most powerful companies in the world demonstrates the enormous market power that it possesses. Qualcomm's exclusive dealing arrangements with Apple were especially damaging to competition in the chipset market because Apple is a critical purchaser of high-end smartphone chipsets. These high-end chipsets have higher prices and margins that allow suppliers to achieve scale and invest additional funds in important R&D efforts.

13

63.    On January 20, 2017, Apple filed an antitrust action against Qualcomm in the Southern District of California due to Qualcomm's anticompetitive practices (*Apple v. Qualcomm Incorporated*, case no. 17-cv-00108). Broadcom, Nokia, and Icera have also previously filed antitrust lawsuits against Qualcomm for its anticompetitive practices.

<u>Inflation of Royalties Through "No License No Chips"</u>

64.    Qualcomm currently employs a "no license no chips" policy to extract inflated patent royalties from OEMs in explicit violation of Qualcomm's FRAND commitments. Qualcomm will only sell chipsets to OEMs who pay a separate royalty rate for Qualcomm's patent portfolio. And Qualcomm demands a royalty rate based on the wholesale price of the cellular phone or tablet rather than the price of Qualcomm's chipset.

65.    Generally, component suppliers rely on component sales, rather than separate patent licenses, to convey to OEMs the intellectual property rights that those OEMs need in order to use or resell the components they have purchased. When a supplier sells a component, such as a chipset, to an OEM, that sale, under the doctrine of patent exhaustion, ordinarily terminates any right of the supplier under patent law to control any further use or sale of the component.

66.    Qualcomm is the only major cellular phone component manufacturer that separately sells the component and the associated intellectual property, rather than conducting a single sale of a component that includes that associated IP rights. The royalty rates that Qualcomm extorts from OEMs far exceed competitive FRAND-compliant rates in numerous ways.

67.    Qualcomm's demand that OEMs license its entire patent portfolio prevents OEMs from determining whether or not specific Qualcomm patents actually need to be licensed—either because the OEM product does not actually infringe on an SEP or the patent is invalid. Qualcomm has rejected attempts by OEMs to license its specific SEPs on FRAND terms. In 2016, Apple attempted to license the specific patents that Qualcomm considered to be SEPs for the 3G and 4G standards. Qualcomm refused to negotiate over specific patents and indeed removed from a list of SEPs that it had previously disclosed to another company.

68.    Qualcomm's demand for a royalty rate based off the entire wholesale price of the cellular device demonstrates its unlawful exercise of monopoly power. Other technology companies

whose business models depend on licensing SEPs, such as ARM Holding ("ARMH"), charge a royalty rate based on the price of the specific chips that rely on ARMH's SEPs—such as its charge of a 1% royalty for the price of a chipset used in Microsoft Xboxes rather than the cost of the overall Xbox product.  Qualcomm, by comparison, charges a royalty rate of 3-5% based off the overall wholesale cost of a device, which is usually in the hundreds of dollars, even though its chipsets sell by themselves for between $10-20. Qualcomm's anticompetitive practice causes overcharges to OEMs, and these overcharges are passed on to consumers.

69.     Normally, if an SEP licensor and a potential licensee cannot agree on FRAND terms, then one side will initiate litigation that will result in a court determining the FRAND royalty rate. The possibility of judicial intervention is a check that ensures a competitive negotiation between licensor and licensee over the exact FRAND rate. Without this judicial check, an SEP licensor can demand supracompetitive royalty rates. Qualcomm's anticompetitive practices force OEMs to pay inflated rates or else lose access to Qualcomm's CDMA and LTE chipsets.

70.     Qualcomm's anticompetitive practices have inflated royalty rates. For example, Apple's four other largest direct licensors collectively have a significantly higher percentage of 4G SEPs than Qualcomm's self-declared 23.5%. But Qualcomm's anticompetitive practices have allowed it to charge higher royalties to Apple than the other four companies combined. In 2014, Qualcomm received 1.92% of total, worldwide cellular phone sales in royalties, collecting total licensing revenues of approximately $7.8 billion.  Four other companies with similar SEP portfolios collected a combined total royalty rate of only .67% of total cell phone sales.

71.     Qualcomm's unlawful exercise of market power is also shown by its continued ability to continue to demand a high royalty rate even though its primary technological contribution, CDMA technology, is not the basis for the 4G standard. While many of its patents have likely expired and the LTE standard is not based on CDMA, Qualcomm continues to demand a 3.25 % royalty rate from licensees for its SEPs related to the 4G standard.

72.     Qualcomm's actions have also decreased innovation. Qualcomm demands cross-licenses from OEM manufacturers for their intellectual property rights as a condition of licensing its SEPs. Qualcomm then includes licenses for those OEM manufacturer patents as a bonus when

it licenses SEPs to other competitors. OEM manufacturers therefore have little incentive to invest in R&D because any technological advances have to be licensed for free to Qualcomm.

<div align="center">Reducing Competition in the Chipset Market</div>

73.    In 2008, there were 11 major manufacturers of chipsets. The market has since grown in size from approximately $10 billion to over $20 billion in revenue. Yet nine of the major chipset manufacturers have exited the market—and none have entered, leaving two manufacturers. The 4G LTE chipset market has gone from moderately concentrated to extremely concentrated in that period of time due to Qualcomm's monopolist power. The following chart, prepared by the Korean Fair Trade Commission, demonstrates Qualcomm's remarkable success in driving its competitors from the chipset market.



<div align="center">&lt;Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies&gt;</div>

| Modem Chipset Maker | Exit (Imminent) Time |
| --- | --- |
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

<div align="center">Government Penalties</div>

74.    Qualcomm's anticompetitive practices have been censured by antitrust regulators in Asia, Europe, and the United States. Government agencies have already levied over $2 billion in fines on Qualcomm for its anticompetitive practices and multiple investigations are still pending.

75.    The Korean Fair Trade Commission ("KFTC") fined Qualcomm $207 million in 2009 and $853 million in 2016 for Qualcomm's unfair licensing practices.  Among other things, the KFTC found that Qualcomm had coerced patent license agreement from handset companies

while holding hostage the supply of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as negotiation leverage in the process of license negotiations with handset companies."[5]  The KFTC found Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the risk of their entire business shutting down."

76.    The Chinese National Development & Reform Commission fined Qualcomm $975 million in 2015 for its licensing practices in violation of the China Anti-Monopoly Law and required Qualcomm to change the licensing terms that it offered for its SEPs to materially lower its effective royalty rate. The Japanese Fair Trade Commission issued a cease and desist order against Qualcomm in 2009 for violating its FRAND obligations. The Taiwanese Fair Trade Commission announced an ongoing investigation into Qualcomm's licensing practices in December 2015.

77.    In December 2015, the European Commission announced two statements of objection against Qualcomm for paying Apple significant amounts to exclusively purchase chipsets from Qualcomm, stifling competition in the market and pricing chipsets below cost in order to hinder competition in the market.

78.    On January 17, 2017, the Federal Trade Commission filed an enforcement action in this Court against Qualcomm for its anticompetitive practices. *Federal Trade Commission v. Qualcomm Inc*., Case No. 17-cv-00220 (N.D. Cal. Jan. 17, 2017). The FTC alleges, among other things, that (1) Qualcomm withholds its chipsets unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (2) Qualcomm has consistently refused to license its SEPs to its competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered into exclusive dealing arrangements with Apple that eliminated competition from the market.

---

[5] See Yoonhee Kim & Hui-Jin Yang, A Brief Overview of Qualcomm v. Korea Fair Trade Commission, CPI Antitrust Chronicle, (Mar. 2015), https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

**HARM TO CONSUMERS**

79.     Plaintiff and members of the proposed Class paid more than they should have for their cellular devices as a result of Qualcomm's monopolistic and anticompetitive behavior.

80.     Every cellular device contains a modem chipset which allows the device to operate on various wireless networks or standards.   Both cellular devices and chipsets are commodity products which share standard specifications.

81.     Qualcomm produces identifiable chipsets that are incorporated into certain cellular devices, including CDMA and premium LTE chipsets. Qualcomm receives a specified, inflated royalty rate on the sale of these cellular devices.

82.     Consumers purchase cellular devices from device manufacturers such as Apple, or through network carriers or other retailers such as AT&T, Sprint, or Verizon.   When consumers purchase cellular devices, these devices have already been equipped with a modem chipset.   Device manufacturers are therefore direct purchasers of Qualcomm products, and consumers are indirect purchasers.   Qualcomm's revenue stream can be traced directly from the consumer to Qualcomm.

83.     The consumer market for cellular devices is subject to intense price competition between OEMs.   Manufacturers and network carriers have thin margins and must set their prices based on component costs.   As a result, OEMs do not simply absorb Qualcomm's unlawful royalties themselves as a percentage of the wholesale cost of the device, but rather pass along some or all of the excessive royalty payments to consumers.

84.     SEP royalty rates and chipsets play a significant role in determining the price of cellular devices. Any increase in the price of chipsets or SEP royalty rates will result in higher prices for the consumer.   And while chipsets often cost as little as $10 to $13, royalty demands associated with this component can approach $60 for a $400 smartphone.[6]

85.     The patent rights owned by Qualcomm, and the corresponding royalty it charges, are closely tied to the cost of cellular devices paid for by consumers.   Qualcomm bases its royalties on

---

[6] See Nomura 2012 Smartphone Guide, http://www.patenttoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Feb. 13, 2017).

CLASS ACTION COMPLAINT

"a percentage of the wholesale . . . selling price of a complete licensed product."  Therefore, purchasers of cellular devices are just one level removed from the unlawful overcharge at issue in this case.

86.     In fact, a pass-through of an increase in the costs of SEP licenses and chipsets into the price of cellular devices themselves is the predicted result of Qualcomm's deceptive and monopolistic behavior.  These inflated prices have been passed on to the Plaintiff and other members of the proposed Class by direct-purchaser manufacturers, distributors, and retailers.

87.     If Qualcomm were to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers would receive fair market prices for their cellular devices.  The amount of Qualcomm's overcharge can be precisely measured through widely accepted statistical and regression modeling.

## **MARKET DEFINITION**

88.     The geographic market for purposes of this action is the United States and its territories.

89.     The relevant product markets are (1) the market for CDMA and premium LTE modem chipsets ("Chipset Market") and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").

90.     Qualcomm directly participates in the market for the sale of cellular devices to Plaintiff and Class members because it manufactures chipsets that are used in cellular devices and imposes licenses on all cellular device manufacturers regardless of whether they use Qualcomm chipsets.

91.     Plaintiff and Class members made purchases in the Chipset Market and SEP Licensing Market when they bought their cellular device or devices.  Plaintiff's injuries are a direct result of Qualcomm's anticompetitve practices with respect to chipsets and abuse of patent licenses because it has increased the cost of buying cellular devices by (1) imposing excessive royalties on SEP licensing in violation of Qualcomm's FRAND commitments, and (2) eliminating competition and allowing Qualcomm to charge inflated prices for its chipsets and licenses.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on his own behalf and on behalf of the following class (the "Class") for claims arising under California law:

    a.    All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA and/or LTE cellular devices from February 14, 2013 through the present. This class excludes the Defendant; its officers, directors or employees; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

93.     In the event California law is not applied to the claims of all Class members for damages regardless of where they reside, Plaintiff will seek certification of the following subclass ("Subclass") under Rule 23(b)(3) for damages under the laws of individual states and the District of Columbia in addition to certification of the Class under Rule 23(b)(2) for purposes of injunctive relief:

    a.    All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA and/or LTE cellular devices from February 14, 2013 through the present. This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

94.     **Numerosity**. Members of the proposed Class likely number in the millions and are thus too numerous to practically join in a single action. Fed. R. Civ. P. 23(a)(1).

95.     **Commonality**. Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual class members. These common questions include:

    a.    Whether Qualcomm held monopoly power in the Chipset Market during the Class period;

b.    Whether Qualcomm acquired or maintained monopoly power within the Chipset Market through anticompetitive activity;

c.    Whether Qualcomm held monopoly power in the SEP Licensing Market during the Class period;

d.    Whether Qualcomm acquired or maintained monopoly power in the SEP Licensing Market through anticompetitive activity;

e.    Whether Qualcomm tied the sale of CDMA and premium LTE chipsets to the purchase of license rights to its patent portfolio;

f.    Whether Qualcomm tied the sale of its SEPs to the purchase of non-SEPs that were also included in Qualcomm's patent portfolio;

g.    Whether Qualcomm leveraged its SEPs to force Apple and other OEMs into anticompetitive agreements;

h.    Whether Qualcomm's unlawful conduct enabled Qualcomm to increase, maintain, or stabilize above competitive levels the prices it charges for patent licenses and its CDMA and premium LTE chipsets;

i.    Whether Class members paid inflated priced for cellular devices as a result of Qualcomm's unlawful conduct;

j.    Whether Qualcomm violated Section 2 of the Sherman Act;

k.    Whether Qualcomm violated Sections 16720 and 17200 of the California Business and Professions Code;

l.    Whether Qualcomm violated California's tort law against monopolization;

m.    Whether Qualcomm unjustly enriched itself through overpayments by Class and Subclass members.

96.    **Typicality**.    Plaintiff's claims are typical of the claims of the proposed class. Plaintiff and the members of the proposed class all purchased cellular devices affected by Qualcomm's anticompetitive conduct; therefore, Plaintiff and all Class members have suffered similar injuries.  Fed. R. Civ. P. 23(a)(3).

CLASS ACTION COMPLAINT

97.   **Adequacy**.  Plaintiff is an adequate representative of the proposed class because his interests do not conflict with the interests of the members of the class he seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex class action litigation, and will prosecute this action vigorously on class members' behalf.  Fed. R. Civ. P. 23(a)(4).

98.   Qualcomm has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

99.   **Superiority**.  A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Qualcomm economically feasible.  Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from Qualcomm's anticompetitive behavior, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT ONE

### Violation of Section 2 of the Sherman Act

### *15 U.S.C. § 2*

100.   Plaintiff incorporates by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

101.   Qualcomm's conduct during the Class period, as alleged herein, constitutes unlawful monopolization of the Chipset Market and SEP Licensing Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The relevant geographic market is the United States.

102.   Qualcomm possesses monopoly market power in the Chipset Market and SEP Licensing Market.

22

CLASS ACTION COMPLAINT

103.    Qualcomm has consistently held an 80 to 90% share of the CDMA chipset market since 2001. Qualcomm held also shares of the LTE Chipset Market over 80% from 2012 to 2014. In 2015, Qualcomm had 69% of the premium LTE market.

104.    Premium LTE and CDMA chipsets are necessary components of cellular devices. Each major U.S. wireless carrier operates premium smartphones such as the Apple iPhone and the Samsung Galaxy that operate on LTE chipsets. No other product, such as CDMA or UMTS chipsets, are available as a substitute for LTE chipsets and no other product constrains the price of LTE chipsets at levels below the monopoly price.

105.    CDMA chipsets are also necessary components of cellular devices on carriers such as Verizon that must support legacy 2G and 3G CDMA standards. No other product, including premium LTE chipsets, are a substitute for CDMA chipsets for devices intended for use on networks that require CDMA compatibility. No other product constrains the price of CDMA chipsets at levels below the monopoly price.

106.    Qualcomm also possesses monopoly market power over the SEP Licensing Market. OEMs must license SEPs in order to comply with SSO standards for cellular devices and networks. Qualcomm has a huge market share of the SEP Licensing Market: it holds nearly all SEPs for CDMA-standard chipsets and many SEPs for LTE-standard chipsets. No other SEPs or other patents can serve as a viable alternative for the licensing of Qualcomm's SEPs by OEMs and competitors because SEPs are by definition essential to the manufacture of chipsets and other cellular components.

107.    Qualcomm's market power over the SEP Licensing Market is demonstrated by its ability to force manufacturers and competitors into non-FRAND agreements which disproportionately benefit Qualcomm. Manufacturers and competitors are forced to agree to Qualcomm's unfair and unreasonable licensing terms, including Qualcomm's practices of tying the licensing of its SEPs to Qualcomm's entire patent portfolio and its "no chips no license" policy.

108.    Qualcomm has also entered into exclusive dealing arrangements with OEMs, such as Apple, that prevent competition from developing in the chipset market. But for Qualcomm's conduct, rival manufacturers would have become stronger competitors in the chipsets markets.

CLASS ACTION COMPLAINT

109.    Qualcomm's refusal to offer SEP licenses on FRAND terms to its competitors, as alleged above, is an unlawful refusal to deal with competitors and an act of monopolization under Section 2 of the Sherman Act. The practice is a key causal component of Qualcomm's acquisition and maintenance of monopoly power in the CDMA and premium LTE chipset markets.

110.    There is no procompetitive justification for the anticompetitive conduct in which Qualcomm has engaged.  In declaring its SEPs to SSOs, Qualcomm agreed to adhere to FRAND obligations. Yet Qualcomm has not done so, and has instead abused its monopoly to force manufacturers and competitors to license its SEPs and utilize its chipsets. As a result, Qualcomm has reduced innovation and competition in the market.

111.    Qualcomm has attempted to maintain its monopoly power through such practices as withholding royalty payments from manufacturers, such as Apple, that have attempted to adopt other chipset technologies and refusing to license SEPs to competitors.

112.    There are substantial barriers to entry and expansion for Qualcomm's competitors. CDMA- and premium LTE- based technology are extremely expensive to develop and require years of R&D. Existing technologies are locked in as a result of the investment and efficiencies of scale necessary develop chipsets. Qualcomm has acquired and maintained a monopoly in the chipset market through its vast number of SEPs for CDMA and LTE chipsets—and has leveraged the force of its intellectual property to also maintain a monopoly in the sale of physical chipsets.

113.    Qualcomm has engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly and to keep prices high and stifle competition and eliminate consumer choice through unlawful exclusionary behavior designed to prevent competition.

114.    There is no legitimate business justification for Qualcomm's conduct.

115.    Qualcomm has charged supracompetitive prices in the Chipset Market. Qualcomm has also charged supracompetive prices in the SEP Licensing Market.

116.    Plaintiff and other members of the Class have paid more for chipsets and Qualcomm's intellectual property than they would have paid but-for Qualcomm's conduct. They have been injured and will continue to be injured in their businesses and property by paying more

for cellular devices than they otherwise would have paid. They have also purchased cellular devices which are of lower quality due to reduced innovation and competition.

117. Plaintiffs and the Class were harmed as a direct and proximate result of Qualcomm's conduct. Plaintiff and Class members seek injunctive relief terminating the ongoing violations alleged in this Complaint.

## COUNT TWO

### Violation of the Cartwright Act

### *Cal. Bus. & Prof. Code § 16700, et seq.*

118. Plaintiff incorporates by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

119. This claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

120. It is appropriate to apply California law nationwide because Qualcomm is headquartered in California and a substantial portion of its unlawful conduct—and profits derived from this unlawful conduct—occurred within California.

121. During the Class period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*

122. Through anticompetitive means, Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power. Qualcomm's conduct constituted a "combination" because Qualcomm coerced co-conspirators including other manufacturers and customers to violate the Cartwright Act to maintain Qualcomm's monopoly power in the relevant markets and to set prices in the Chipset Market and the SEP Licensing Market at supracompetitive levels.

123. The Chipset Market and the SEP Licensing Market are markets for commodities.

124. The contracts, trust, or conspiracies alleged herein reduced competition, stifled innovation, and increased prices in the Chipset Market and the SEP Licensing Market.

125.    As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and Class members paid and have continued to pay supracompetitive prices for cellular devices. Plaintiff have paid more for devices containing than they otherwise would have paid.

126.    Plaintiff and the Class members seek treble damages and the costs of suit, including reasonable attorney fees, pursuant to Section 16750(a).

## COUNT THREE

### Violations of Unfair Competition Law

### *Cal. Bus. & Prof. Code § 17200, et seq.*

127.    Plaintiff incorporates by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

128.    Qualcomm's acts and practices constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

129.    Qualcomm's acts and practices constitute unlawful business practices, as discussed elsewhere in this Complaint, in that they violate the Sherman Act and Cartwright Act.

130.    Qualcomm's acts and practices constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Qualcomm's conduct is outweighed by the harm to consumers; (iii) the injury is not one that consumers reasonably could have avoided; and/or (iv) the conduct runs afoul of the policies underlying the Sherman Act and Cartwright Act.

131.    Qualcomm's acts and practices constitute fraudulent practices in that they induced SSOs to adopt and manufacturers and competitors to license Qualcomm's SEPs under the misrepresentation that the Qualcomm would adhere to FRAND.

132.    Qualcomm's acts and practices were likely to deceive a reasonable consumer, who would not have purchased a cellular device, or would have paid substantially less for a cellular device, had Qualcomm disclosed its monopolistic business practices.

133.    It is appropriate to apply California law nationwide because Qualcomm is headquartered in California and a substantial portion of its unlawful conduct—and profits derived from this unlawful conduct—occurred within California.

26

134.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff and the proposed Class have suffered injury in fact and lost money or property, in that they bought or leased cellular devices they otherwise would not have, overpaid for their devices, and did not receive the benefit of their bargain. Meanwhile, Qualcomm has profited from its unlawful behaviors, thereby unjustly enriching itself.

135.    Qualcomm's illegal conduct is continuing, and there is no indication that it will not continue such activity in the future.

136.    Qualcomm's unlawful and unfair business practices have caused and continue to cause Plaintiff and the Class members to pay supracompetitive and artificially-inflated prices for chipsets (or products containing baseband processors) and licenses to Qualcomm's SEPs.  Plaintiff and the Class members suffered injury in fact and lost money or property as a result of the unfair competition.

137.    Plaintiff and Class members are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Qualcomm as a result of its unlawful business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

## COUNT FOUR

### Violations of California's Tort Law Against Monopolization

138.    Plaintiff incorporates by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

139.    By virtue of the conduct described above, Qualcomm has engaged in tortious and unlawful monopolization of the Chipset Market and the SEP Licensing Market.

140.    Qualcomm's conduct gives rise to a cause of action for common law monopoly under California law on behalf of plaintiff and the Class members.

141.    As a direct and proximate result of Qualcomm's unlawful acts of monopolization, Plaintiff and the Class members have suffered actual damages in an amount to be proven at trial.

142.    Qualcomm's acts of monopolization were intended to monopolize and suppress

CLASS ACTION COMPLAINT

competition in the relevant market and to injure consumers. Qualcomm's acts include acts of fraud, malice, and oppression and were and are taken with conscious disregard for the rights of consumers, including Plaintiff and the Class members.  Accordingly, an award of punitive damages is justified for reasons of punishment and deterrence. Plaintiff and the Class members seek an award of punitive damages in an amount to be proven at trial.

<div align="center">

**COUNT FIVE**

**Unjust Enrichment**

</div>

143.    Plaintiff incorporates by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

144.    This claim is brought under California law on behalf of all Class members. In the event the Court does not apply California law to this claim on a nationwide basis, this claim is brought on behalf of all Subclass members based on the laws of the individual States and the District of Columbia.

145.    As a result of its unlawful conduct described above, Qualcomm has and will continue to be unjustly enriched. Qualcomm has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Chipset Market and the SEP Licensing Market.

146.    Defendant has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the overpayments made by Plaintiffs and members of the Class and Subclass.

147.    Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiff and the Class members may seek restitution.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiff prays for judgment as follows:

a.    For an order certifying the proposed Class and Plaintiff's counsel to represent the classes;

<div align="center">

28

</div>

b.      For an order enjoining Qualcomm's anticompetitive and unlawful conduct in violation of federal and state antitrust laws;

c.      For an order awarding Plaintiffs and Class members actual, statutory, punitive, treble, or any other form of damages provided by law;

d.      For an order awarding Plaintiff and Class members restitution, disgorgement, or other equitable relief provided by law or as the Court deems proper;

e.      For an order awarding Plaintiff and Class members pre-judgment and post-judgment interest;

f.      For an order awarding Plaintiff and Class members reasonable attorney fees and costs of suit, including expert witness fees; and

g.      For an order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury for all issues so triable under the law.

Dated: February 14, 2017                  Respectfully submitted,

                                          **GIBBS LAW GROUP LLP**

                                          By:   */s/ Eric H. Gibbs*
                                                Eric H. Gibbs

                                          Eric H. Gibbs
                                          Michael Schrag
                                          Caroline Corbitt
                                          **GIBBS LAW GROUP LLP**
                                          505 14th Street, Suite 1110
                                          Oakland, California 94612
                                          Telephone:  (510) 350-9700
                                          Facsimile:  (510) 350-9701
                                          ehg@classlawgroup.com
                                          mls@classlawgroup.com
                                          ccc@classlawgroup.com

CLASS ACTION COMPLAINT